## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ESCO LEWIS BLAYLOCK, III,

                    Plaintiff,

    v.

TRANSPORTATION SECURITY
ADMINISTRATION, HOMELAND
SECURITY and SECRETARY MICHAEL
CHERTOFF,

                    Defendants.

Civ. Action No. 07-464 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

### I. INTRODUCTION

In this employment discrimination lawsuit, *pro se* plaintiff Esco Lewis Blaylock, III ("Blaylock") is suing his former employer, the Transportation Security Administration ("TSA"), an agency within the United States Department of Homeland Security, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-16, alleging that TSA unlawfully discriminated against him by not promoting and by ultimately firing him based on his race and sexual orientation.  Blaylock claims he is a bisexual male and has Native American ancestry.

Before the Court is defendant's motion for summary judgment.   The Court's federal question jurisdiction is undisputed and proper pursuant to 28 U.S.C. § 1331.  Venue is also undisputed, and is proper in this Court pursuant to 28 U.S.C. § 1391(e)(2).

### II. BACKGROUND

#### A.      *Facts*

On August 25, 2002, Blaylock began working at Newark Liberty International Airport as a Transportation Security Officer with TSA.  (Pl.'s Nar. Statement ¶ 1.)  On or about January 25,

2004, Blaylock submitted a promotion application for the position of Supervisory Transportation Security Screener.  (Pl.'s Nar. Statement ¶ 10.)  In order to generate a list of certified candidates for the position, TSA headquarters in Virginia utilized a human resources contractor ("HR contractor") to develop a list of applicants who could be certified as meeting the basic qualifications.  (Ruiz Decl., Sept. 11, 2008, ¶ 4.)  A group of 27 Newark Airport screening supervisors and managers formed a panel that evaluated the 143 certified candidates the HR contractor provided.  (Ruiz Decl., ¶¶ 2-3.)

As the first requirement listed under "Qualification Requirements," the position vacancy announcement specified that "All applicants must demonstrate at least six months of experience performing the duties of a Lead Transportation Security Screener."  (Ruiz Decl., Exh. A at 3.)  Although Blaylock did not meet that criterion (Blaylock Dep. 116:5-9), he submitted his application anyway, and advanced through the first selection round with a score of 16 out of 18, which placed him among the 73 candidates on the "primary list."  (Ruiz Decl. ¶ 8.)  The panel members were then given the opportunity to oppose promotion of any of those 73 candidates by justifying, in writing, their reasons for opposing a given candidate's promotion, after which the candidate was eliminated from the process.  (*Id.*)

Three panel members, all supervisors who worked with Blaylock, opposed his candidacy. Their written notes describe him as unreliable, lacking leadership skills, and possessing an insubordinate attitude.  (Ruiz Decl., Exh. F3 at 22-24).  Henry Murray wrote that Blaylock "would not report to assignments he did not want.  He would constantly get lost and not tell his supervisors."  Another supervisor, Lawrence Callahan, believed Blaylock "show[ed] little initiative to work lanes and perform other screening duties and exhibits no leadership skills." According to supervisor Curtis Harriott, Blaylock "never worked any position other than the exit

lane and never willingly accepts any task given," and Blaylock "does not see the big picture." (Ruiz Decl., Exh. F3 at 22-24 (copies of individual signed statements by Murray, Callahan and Harriott).)   In his motion papers, Blaylock asserts that his co-workers "praised [him] for his . . . duties and hard days work . . . [and] willingness to stay [overtime]" (Pl.'s Nar. Statement ¶ 8), but he does not present third-party support for this.

Blaylock asserts that his co-workers and supervisors made fun of his Native American heritage and sexual orientation, and generally "hazed" him during work.  (Pl.'s Nar. Statement ¶¶ 4-5, 9, 11, 21-24, 33-34.)   In his factual narrative, Blaylock identifies fellow screeners Tina McLeod and Jerrell Jones as potential witnesses, but he does not provide affidavits or other documentary evidence from them.  (D.E. 110-4, p. 24.)  No other evidence appears in the record that co-workers or supervisors made disparaging comments about Blaylock's heritage or sexual orientation.   Blaylock did formally complain that he was being mocked by co-workers, and documents show that TSA granted Blaylock's December 10, 2004 request for lane change a few days later.   (*Cf.* Perron Decl. Exs. F (request for schedule change), H (email correspondence discussing granted transfer); *see also* Pl.'s Nar. Statement ¶¶ 21-25.)

By his own account, Blaylock's grounds for Native American racial identity are premised on an informal conversation with his father "sometime in 2002," from which Blaylock asserts that he discovered his heritage to be Native American from the Blackfoot Tribe.  (Pl.'s Mem. Disp. Summ. J. 3.)  Blaylock testified that he did not identify himself as Native American on his TSA application.  (Blaylock Dep. 67:11-13, Apr. 16, 2008.)  According to Blaylock, his great-grandmother on his father's side is Native American.[1]   (Blaylock Dep. 64:21-67:1, Apr. 16, 2008.)   Blaylock testified that he has not further investigated his Native American heritage

---

[1] Although Blaylock states that his Native American heritage descends through one of his two paternal great-grandmothers, he also inconsistently asserts that his father is 75 percent Native American.  (Blaylock Dep. 65:5-6, April 16, 2008.)

despite the fact that his great-grandmother lives in the Bronx, New York, as did Blaylock at the time briefing was submitted.  (*Id.*)  Blaylock also testified that he never lived on a Native American reservation, has never attended any Blackfoot events, and is unsure exactly where the Blackfoot reservation is located, other than that it is somewhere in upstate New York.  (Blaylock Dep. 93:5-18, May 14, 2008; Blaylock Dep. 64:24-25, 67:3-9, April 16, 2008.)

Blaylock testified that a few TSOs inquired about his race, and asserted that people felt he looks "more of a Native American" during the summer time "because [his] skin becomes real red . . . ."  (Blaylock Dep. 63:22-64:10, April 16, 2008.)

> Q. Did you state on your application for employment with TSA that you were Native American?
> A. Initially, no, I haven't.
> Q. Did your application for promotion in 2004 state that you were Native American?
> A. I'm not certain.
> Q. Did you ever tell any TSA employee that you were of Native American ancestry?
> A. Yes. An employee asked me, and I said yes.
> Q. What employee was that?
> A. I'm not certain of the name.  I know we called her Z.  I think it started with a Z.  She's a lead but I forgot her name.

(Blaylock Dep. 67:11-23, April 16, 2008.)  Blaylock further testified about the manner in which other TSA co-workers learned and inquired about his purported Native American identity:

> Q. This TSA employee who was a security screener who asked you if you were a Native American, did she ask it in a nice way?
> A. In a matter of fact way.
> Q. Did she ask it in an offensive way?
> A. Not that I took, no.
> Q. Okay. So you were not offended by her inquiry.
> A. I was more surprised.
> Q. Okay. What did you tell her?
> A. I said yeah, I am.
> Q. Now, did you speak with anyone else at TSA about the fact that you were Native American?
> A. Thereafter, two other people asked me about my heritage.

Q. Who was the – what was the next time when someone asked you about your Native American heritage?

A. It was shortly after – I can't elaborate the time distance, but it was, you know, maybe the next day, next two days.  We had a Native American actually working on the checkpoint that I didn't know about, you know, what his heritage was, and he asked me.

Q. So this was in early 2004?

A. Yes.

Q. And what was that employee's name?

A. Rudolph – short for Rudy.  I'm not sure of his last name, but he's a lead screener now.

Q. At what checkpoint; do you know?

A. The last I know when I worked there, he was at A2.  Right now, I don't know.

Q. And what did he say?

A. Well, he asked me also, he says hey, I heard you was Native American.

Q. Okay. And what did you respond?

A. I said yes, I am.  He asked me who was Native American in my family, and I told him my father.

Q. Okay.

A. Thereafter, he asked me have I ever been to a powwow and such and such, you know.  I told him no.  That was something that was just new to me.

. . .

Q.  Okay.  And did you ask Rudolph about his Native American background?

A. No. We just talked.

Q. Did he invite you to a powwow?

A. No.

Q. Did you consider his inquiry offensive?

A. No.

Q. Did you tell him who told him that you had Native American ancestry?

A. No.

Q. Did you ask him?

A. I haven't asked him.

Q. Did you ask the other woman who asked if you were Native American, did you ask her how she heard?

A. No.

. . .

Q.  Okay.  So you're not sure how Rudolph or this other woman heard about your Native American ancestry, correct?

A. That's correct.

Q. Okay.  Were you insulted by Rudolph's inquiry?

A. No.

Q. Okay.  And then you mentioned a third person who spoke to you about your Native American ancestry?

A. They mentioned it briefly along with another comment, which was insulting.

Q. Okay.  When was this conversation?

A. This was during – I was doing an overtime shift in checkpoint C2 in 2004 – I think it was early 2004 – and while this was just as the shift was about to change -- no, no, no.  This was on my day off, because I often worked seven days out of the week.  So I'd come in on my regular day off and I would work different checkpoints other than my, you know, regular checkpoint. I may be at C2.  I may be in baggage.  You know, wherever they may need me.  So that particular day, I was at C2.

We had a supervisor – I'm trying to think of his name.  But he had asked me – he had asked me – he says – he had mentioned about my heritage, but then he had said, you know, out loud, you know, by the podium, and you're not gay, are you?  Just like that.

Q. What's this supervisor's name?

A. And it wouldn't narrow it down if I say he has gray hair.  I forget his name, but he has relations with the lead, the female that I spoke about.

Q. What time of day was it?

A. This was in the – this was during the morning shift, the first shift.

Q. Okay. What time would that be?

A. It could have been between 10:00, 11:00, because it was relatively – the rush hour slowed down, so I'm only approximate it was around that time.

Q. And who else was present?

A. You had people in the distance but not close enough. I'm not sure whether they heard or not, and I didn't check to see if anybody did hear, because I wanted to try to save face and, you know, not even acknowledge it.  But it was offensive to me.

Q. Do you know the names of the any people who were present at that time?

A. No.

Q. So I guess it would be fair to say you don't know the names of anybody who heard that comment.

A. Yeah.  I mean you know, I don't know their names. You know, I don't know their names.

Q. And you don't know if they heard.

A. I can only assume, because the podium is here and the first immediate lane, it was – it's to the right. That's the closest.  So you had people right there.  I mean, the way that checkpoint is designed, you voice can echo.  And it –

Q. Can or cannot?

A. It can. It will echo.

Q. So how many people do you think heard?

A. The four people that was on that lane. I don't know that lane – I don't know their names, because I don't readily work that checkpoint.

Q. On this occasion, was your Native American ancestry brought up?

A. I mean, at first the comment was made about, you know, my Native American ancestry, but then it was just – that comment came out real quick.

> Q. What was the comment about your Native American ancestry?
> A. You're Native American? What, and you're gay? Like that.
> Q. Was it "What, and you're gay?"   Or "You're not gay."
> A. Something along that lines, you know. It was some time ago, but it was something along that lines, and I became extremely offended by it, and that's what, you know, really prompted me to, you know, officially file that EEO.

(Blaylock Dep. 72:10-78:21, April 16, 2008 (portions omitted).)

On his sexual identification, Blaylock characterizes himself as "a male who is bisexual" in the first paragraph of his Statement of Facts (Pl.'s Statement Facts 3), and he testified in his deposition that he has had four or five sexual encounters with male-to-female transsexuals and/or male-to-female transvestites.  (Blaylock Dep. 55:24-58:15, April 16, 2008.)

The record shows that within the six months prior to his termination on November 21, 2006, Blaylock was involved in two separate incidents with airline passengers on their way through security checkpoints at Newark Liberty International Airport.  Vincent Mossa, one of Blaylock's supervisors, testified that on July 7, 2006 passenger Norberto Pagan filed a complaint against Blaylock for being rude, aggressive, and argumentative with Pagan and his wife.  (Mossa Dep., Apr. 30, 2008, 43:6-44:22.)

Later that month, on July 23, 2006, a second incident occurred between Blaylock and a handicapped individual, Rogelio Marroquin, a non-passenger who was given a visitor pass to assist his elderly mother through the security checkpoint.  (Pl.'s Mem. Disp. Summ. J. 13-14.) There is some dispute as to whether Blaylock pushed or shoved Marroquin and whether he damaged Marroquin's cell phone during the incident, but Blaylock states that Marroquin quickly filed a grievance against him with Michael Lynch, one of Blaylock's supervisors, regarding this encounter with Blaylock at the security checkpoint.  (Pl.'s Mem. Disp. Summ. J. 15.)

On September 19, 2006, TSA informed Blaylock of its intention to terminate his employment.[2]  (Pl.'s Nar. Statement ¶ 57.)   On November 1, 2006, however, TSA offered Blaylock the opportunity to retain his job with TSA at Newark if he agreed to dismiss all pending EEOC proceedings against TSA, and relinquished his right to file any future complaints if he were to be terminated after accepting this agreement.  (Pl.'s Nar. Statement ¶¶ 58-59.) After Blaylock rejected this so-called Last Chance Agreement, TSA terminated Blaylock's employment on November 21, 2006.  (Pl.'s Nar. Statement ¶¶ 60, 62.)

### B. Blaylock's EEOC Complaints and the Present Action

On December 28, 2003, shortly before submitting his application for promotion, Blaylock filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that other TSA security screeners made "constant remarks about his sexual orientation . . . and . . . his heritage" at work.  (Pl.'s Mem. Disp. Summ. J. 5.)   After being denied the Supervisory Transportation Security Screener promotion in March 2004, Blaylock revised his original complaint to include a complaint of discrimination in the promotion selection process, based on his race and sexual orientation.  (Pl.'s Mem. Disp. Summ. J. 8.)  The allegations within the amended complaint were investigated by the EEOC, and subsequently dismissed in a hearing by Administrative Judge Francis A. Polito on October 12, 2005.  (Perron Decl., Oct. 22, 2008, Exh. P at 1.)  Judge Polito ruled that Blaylock's sexual preference is not a protected class under Title

---

[2] Blaylock's last incident before termination occurred on September 13, 2006, four days after receiving a notice that TSA filed an "Intent to Terminate" letter against him, and involved Blaylock's leaving work for medical reasons. (Pl.'s Nar. Statement ¶¶ 53-54.) Blaylock, "feeling dizzy and ill," left the airport on a gurney with EMS staff.  (Pl.'s Nar. Statement ¶ 54; *see also* Perron Decl. Exh. W.)  Blaylock received an Absence Without Leave ("AWOL") annotation on his time sheet, but this annotation was removed once Blaylock submitted a doctor's note the following week.  (Mossa Dep. 61:19-62:5, Apr. 30, 2008.)  Blaylock never alleges or infers that this AWOL annotation, which Mossa subsequently removed from his employment file, was added because of discrimination against him based on his race or sexual orientation.  Although not necessarily "common practice" at Newark Airport or TSA in general, Mossa explained that he has "AWOL'd" other employees who left work due to illness and later neglected to submit proper medical documentation.  (Mossa Dep. 62:14-63:12.)  Katherine Anchundia, the Federal Security Supervisor on duty for this incident and the officer who actually added the AWOL annotation on Blaylock's file, remarked that she was unaware of Blaylock's prior EEOC complaints when she marked him as AWOL.  (Anchundia Interrog. Exh. W at 000109, Aug. 3, 2007.)

VII of the Civil Rights Act, so any discrimination based on his sexual orientation instead could be regarded as sexual harassment, but in that case Blaylock had not offered sufficient evidence to make that claim.  (Perron Decl., Exh. P at 4.)  As to Blaylock's claim of race discrimination, Judge Polito ruled that although Blaylock established a *prima facie* case of race discrimination, TSA nonetheless put forth legitimate non-discriminatory reasons for his non-promotion, and Blaylock had not shown those reasons to be simply a pretext for race discrimination.  (Perron Decl., Exh. P at 4-6.)  The legitimate non-discriminatory reasons included a lack of "requisite experience . . . appropriate conduct . . . [and] attitude for the supervisory position at issue." (Perron Decl., Exh. P at 5.)  Further, primarily due to a lack of evidence, Judge Polito rejected Blaylock's allegations that his co-workers' derogatory comments were linked to his subsequent non-promotion.  (Perron Decl., Exh. P at 6.)

On November 17, 2006, only days before being terminated by TSA and over a year after Judge Polito's ruling dismissing his complaint, Blaylock appealed.  (Perron Decl., Exh. P at 0120070723.)  The EEOC reviewed *de novo* and affirmed Judge Polito's decision finding that a preponderance of the record evidence did not establish any occurrence of discrimination in the March 17, 2004 promotion selection process.  (Perron Decl., Exh. P at 0120070723.)  The EEOC appellate decision was issued on April 27, 2007, and included a right to sue letter.  (Perron Decl., Exh. P at 0120070723.)

In the federal lawsuit, Blaylock alleges that his non-promotion in March 2004 and termination in November 2006[3] resulted from discrimination against him based on his race and

---

[3] Blaylock filed a second formal complaint of employment discrimination with EEOC on March 3, 2007, which centered on the circumstances of his November 2006 separation from TSA.  The March 2007 EEO complaint was never heard by an administrative judge because Blaylock filed a second action in U.S. District Court on July 25, 2007 (07- 3485). The second-filed 07-3485 action was consolidated for all purposes with the first-filed 07-464 action on August 29, 2007.  (Perron Decl., Exh. S.)

sexual orientation, thereby violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-16.[4]

### III. STANDARD FOR SUMMARY JUDGEMENT

Summary judgment shall be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court's obligation is to "[view the facts] in the light most favorable to the nonmoving party and [must] draw all inferences in that party's favor."  *Gray v. York Newspapers*, 957 F.2d 1070, 1078 (3d Cir. 1992).

In order to successfully counter a summary judgment motion, the nonmoving party must provide "specific facts" showing that there is a genuine issue of material fact that must be decided through a trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When deciding if there is a genuine issue, the Court must draw all justifiable inferences in the favor of the nonmoving party, and that party's evidence must be regarded as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### IV.   DISCUSSION

### A.  Legal Standards

Title VII of the Civil Rights Act of 1964 states in pertinent part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .
>
> It shall [also] be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has

---

[4] On August 29, 2007, the Court ordered the two cases filed by Blaylock against TSA consolidated, and Blaylock amended his complaint several times.  Subsequently, Magistrate Judge Patty Shwartz struck Blaylock's claim under 42 U.S.C. § 1981 from the Third Amended Complaint.

> opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a).  Section 1983 of the Civil Rights Act of 1871 provides private individuals the option to sue based on violation(s) of federally-protected rights, and enforce rights such as the prohibition of public sector employment discrimination based on race, color, religion, sex, or national origin, as stated supra in Title VII.  42 U.S.C. § 1983.

Under the traditional *McDonnell Douglas* burden-shifting paradigm for analyzing employment discrimination actions, the plaintiff has the initial and relatively light burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The defendants must then posit a legitimate non-discriminatory justification in response.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  If such justifications are put forth, the discriminatory inferences are dispelled, and the burden of going forward returns to the plaintiff to rebut those justifications as pre-textual.  *Id.*

To defeat summary judgment at the third stage of the *McDonnell Douglas* analysis, the plaintiff  "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either:  (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Id.* at 764.  To do this, the plaintiff may not nakedly refute the non-discriminatory justification as unbelievable; but the plaintiff is not required to "adduce evidence directly contradicting the defendant's proffered legitimate explanations …."  *Id.*  To defeat summary judgment, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, contradictions, or incoherence in the employer's proffered

11

legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) (emphasis inserted in *Fuentes*)).

### B.  Application of Law to the Facts

#### 1.      Race Discriminations Claims

##### *i. Prima Facie Proofs*

The elements of a *prima facie* case "must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination."  *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).

##### *a. Prima Facie Claim of Termination Based on Race*

To establish a *prima facie* case of discriminatory treatment based on race, Blaylock must establish:  (1) is a member of a protected class; (2) was qualified for the position he held; (3) was fired from that position; and (4) suffered adverse action under circumstances that give rise to an inference of discrimination.  *Johnson v. St. Luke's Hosp.*, 307 Fed. App'x 670, 671-72 (3d Cir. 2009) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)).

As to the protected class element, drawing inferences in favor of the non-movant, despite thin, anecdotal evidence, the Court will accept Blaylock's identification as a Native American, and there is no dispute that he is a person of color, as demonstrated at his deposition:

> Q. . . . you don't believe that he wrote his note because you are an African American, do you?
> A. He's African American.
> Q. So the answer is you don't believe that he took action – he took that as a factor in his decision.
> A. I don't know.
> Q. Okay.
> A. You know, I'm not claiming to be African American so --.
> Q. You're not claiming to be African American?

> A. No. I'm saying no, impartial.  I'm not claiming to be African American.  I said I was American Indian.
>
> Q. We have a claim here for race discrimination.
>
> A. Okay.
>
> Q. What do you consider your race to be?
>
> A. American Indian.
>
> Q. So you are not claiming that you were discriminated against on the basis of being black?
>
> A. My skin being –
>
> Q. Color?
>
> A. The color, yeah.
>
> Q. Okay, got you.
>
> A. See, Ms. Perron, I don't know if you understand.  You can go to Puerto Rico or Honduras where they have –
>
> Q. There's no question pending.
>
> A. Okay.
>
> . . .
>
> Q. You just told me that black is your color not your race?
>
> A. Yeah, black is the color of my skin.

(Blaylock Dep. 100:12-101:12; 101:21-23, May 14, 2008.)  Moving to element two, it seems that up until two customer complaints were filed against Blaylock just prior to his termination, he was performing at a minimum satisfactory level such that he avoided being terminated.  Blaylock was given overtime and was not targeted for elimination from TSA for an appreciable period of his service.  Element three is satisfied because Blaylock was fired.  Element four is also satisfied because there is no dispute that Caucasian employees kept their jobs when Blaylock was fired.

### b. Prima Facie Claim of Failure to Promote for Race Discriminatory Reasons

To establish a *prima facie* case of discrimination in a failure to promote context, Blaylock must prove that:  (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was rejected despite his qualifications; and (4) after his rejection, a similarly-situated individual from a non-protected class was promoted, or the position remained vacant and the employer continued to search out applicants from others with plaintiff's qualifications.  *Dooley v. Roche*

*Labs, Inc.*, 2007 U.S. Dist. LEXIS 10467, at *15 (D.N.J. Feb. 15, 2007) (Brown, C.J.), *aff'd*, 275

F. App'x 162 (3d Cir. 2008) (citing *Fuentes*, 32 F.3d at 763).

As found above, Blaylock's evidence puts him in a protected class, whether Native

American or black, and the first prong is thus satisfied.  Whether he was qualified for the

position involves a more complex analysis.  In the official "Vacancy Announcement" posted by

the TSA for the position Blaylock sought, directly beneath the header "Qualification

Requirements," TSA stated:  "All applicants must demonstrate at least six months of experience

performing the duties of a Lead Transportation Security Screener, SV-0019-F (GS 9 level) or

equivalent specialized experience gained in the Federal government or private sector."  (Ruiz

Decl., Exh. F3 at 3.)  Blaylock does not dispute that he did not have "six months" of experience,

but he claims that it was impossible for anyone to accumulate the requisite six months training

time:

> Q. Okay.  Before you applied for the promotion, how many days had you
> acted as lead screener?
> A. Between the first and second shift, you know, overall, ever, you know,
> maybe five times I've been asked to be the lead the lead of the lane.
> Q. And before you applied for the promotion that's the subject of this
> lawsuit, had you acted as a supervisor at all?
> A. Well, no one has in the screener position.  No one's given that
> opportunity in the screener's position.
> Q. Okay.
> A. The guy – you know, we can put acting – they can put a basic screener
> as an acting lead, but they – you know, it's very special circumstances where they
> will put an actual screener – and it didn't happen – you know, it may have a
> happened once, where they put a screener as acting supervisor.  I only heard that
> happen once.
> Q. Was there a requirement for the position that you applied for that the
> applicant had to have served as lead screener for some period of time?
> A. At that time, no.

(Blaylock Dep. 116:5-25, Apr. 16, 2008.)  The fact that Blaylock was included as one of the 143

certified candidates by the HR contractor supports Blaylock's position that experience as a lead

screener was not essential to achieving certified candidate status.  Thus, although Blaylock had not met the minimum posted requirements for the position, his non-promotion claim must be allowed to proceed past prongs two and three because the HR contractor did not disqualify him, and he ultimately did not receive the position.

The Court is satisfied that Blaylock has established the fourth element of the *prima facie* claim of non-promotion, because some of the candidates promoted to Supervisory Transportation Security Screener were white.

### c. Prima Facie Claim of Retaliation

To make a *prima facie* showing, Blaylock must establish that (1) he engaged in protected activity; (2) defendants were aware of that protected activity; (3) defendants took some adverse action against him; and (4) "circumstances were sufficient to permit the inference that the protected activity was a contributing factor for the adverse action."  *Hasan v. U.S. Dep't of Labor*, 545 F.3d 248, 251 (3d Cir. 2008).  Blaylock did engage in protected activity in that he filed complaints with the EEOC asserting on-the-job discrimination.  TSA was aware of this protected activity because it defended against Blaylock's contentions of racism in the course of the EEOC process.  In addition, Blaylock asserts that a co-screener, John Pickerelli, mentioned to Blaylock that he had personally seen details of Blaylock's EEO complaint.

Blaylock satisfies the third prong because he was not promoted.  As to the fourth factor, there is sufficient evidence permitting the inference that the protected activity was a factor in the adverse action.  In a broad sense, Blaylock can make out a *prima facie* case of retaliation by citing his termination and non-promotion.

### ii. Burden Shifting Analysis

### a. Discriminatory Treatment Based on Race

The burden of production (not persuasion, which remains with Blaylock) shifts to TSA to posit a legitimate non-discriminatory justification for the adverse employment action, here Blaylock's termination.  *See McDonnell Douglas Corp.*, 411 U.S. at 801-04.  If TSA provides such justifications, the burden will return to Blaylock to rebut those justifications as pre-textual.

TSA's proffered justification for terminating Blaylock, expressed in the November 13, 2006 Decision of Removal issued by Federal Security Director Mark Hatfield, Jr., was "threatening behavior against a customer."  (Perron Decl., Exh. R.)  The incident was described in the Decision of Removal letter:

> Reason: Threatening Behavior Against a Customer.  Specifications: On July 23, 2006, at approximately 5:30 AM you had a verbal and physical altercation with passenger Rogelio Marroquin Terminal B, Security Checkpoint B-1.  According to the statements provided (attached) you verbally and physically assaulted Rogelio Marroquin by throwing his cell phone, angrily telling him to leave the checkpoint and pushing him through the Walk Though [sic] Metal Detector (WTMD).  You were in violation of HRM Letter 735-1 (attached), Policy on Employees Responsibilities and Conduct.

The November 13 letter advised Blaylock that this conduct violated TSA policy forbidding threatening conduct against a customer, and cited an earlier customer incident, stating:

> You were previously issued a formal counseling by STSO Vincent Mossa on July 7, 2006 for failure to exercise courtesy and tact while dealing with a passenger.  That counseling put you on notice that such behavior is unacceptable in the workplace.

Although Blaylock refused to sign to acknowledge receipt of the November 13 letter, it served as his termination letter, ordering him to turn in his TSA-issued property and cease reporting to work.

Vincent Mossa, a TSA supervisor, testified regarding the July 7, 2006 incident with passenger Norberto Pagan that TSA claims put Blaylock "on notice":

> Q. On July 7, 2006, there was an incident involving the plaintiff? Do you remember that incident?

16

A. Yes, I do.

Q. In your own words, can you briefly tell us what happened in that incident?

A. Okay. I was in the checkpoint office, which simply had a curtain across the entrance. And I was working on either records or some other documents, and I heard yelling and screaming. I slid the – I was sitting in a chair. I slid the curtain open, and the office – the curtain – the entrance to the office is approximately maybe five feet from the middle lane. And I observed a passenger and the complainant almost nose-to-nose, within inches – within six, seven inches of each other.

The plaintiff was shoving a – well, not shoving. He was holding his ID, Newark Airport ID, directly in front of the passenger's face. I couldn't really make out the words. You know, there was a lot of noise. And there was arguing going back and forth.

And Aida Contino, who was on the lead, she was – I recall her directing the plaintiff to return to his post. She said that several times, and the plaintiff ignored her and continued showing the ID to the passenger. And they were still arguing back and forth.

I then at that point directed the plaintiff to come into the office, first of all, to separate him from the passenger, calm him down, calm everybody down. I had to direct him two or three time because he refused to do it. He even threatened to call the Port Authority Police. And the only way I was able to get to him, I explained to him, I said if you call the Port Authority Police, they more likely will be taking him out in handcuffs out of the terminal, meaning the way he was acting, very aggressive.

He finally sat down, and I got a quick idea of what happened. And I went and spoke with the passenger. He was headed down to the gate area. It's approximately – I don't know – 300 yards from the checkpoint, down a long hallway approximately 300 yards to the gate area where you actually get on the flight. He was running late for his flight. And what he explained to me, there was a problem. His wife was in front of him on the – I believe that was lane three, the far – no, that was lane one. The far – as you're looking out the sterile area, looking outside the checkpoint, the far left lane, okay?

His wife was in front of him. And some remarks, which I don't recall, were made by the X-ray operator concerned about unloading. And he – the passenger expressed dissatisfaction at the customer service he was receiving, and he asked the plaintiff not to talk to his wife that way. This is what the passenger is telling me, of course.

The passenger then further stated that he was instructed by the X-ray operator, who turned out to be the plaintiff, that he wasn't going to be screened there, that he needed to go to another lane. The passenger then proceeded to the middle lane. He came through, and I believe he requested the name of the plaintiff from one of the other personnel, one of the screeners on the middle lane.

At that point, the plaintiff, who was the X-ray operator, left his post, walked across, which is maybe 30 feet, had to get, you know, by the rollers for the baggage, went past there, went past the checkpoint office – and, you know, it was

right there at lane two – and started – well, continued the argument with the passenger.

It was at that point when I heard all the commotion that I got involved and I separated them, and I sent them – I sent the plaintiff inside the office to sit down.

I continued on, and this – I got his information.  He provided me the statement.  I got his, you know, pedigree, his name, birth date, address, telephone number.  And I said I would look into the matter, and if need be, would he be willing to be interviewed further if this – you know, if it needed to further investigation.  He had no problem with that.  He gave me his phone number.  He was still hot under the collar.  He was still upset about what happened at the checkpoint between him and the plaintiff, between the plaintiff and his wife.

I apologized several times, you know, on behalf of the TSA and I said I'd look into the matter.  And, you know, hopefully, this wouldn't upset, you know, his plans for the – you know, for his flight or whatever.  It wouldn't affect the flight.

Then I came back and I asked the plaintiff what happened, and he basically told me the same data.  But he explained that he went over there because he heard that he was looking for his – the plaintiff heard that the passenger was looking to identify the plaintiff, so he went over there to provide identification.

I asked him well, where was he assigned at that point.  He said he was on the other lane, on the X-ray. And I asked him well, what were you doing over there?  How did you end up over there?  Well, I heard he was looking for me, so I went over there.  I said well, but if you're on the X-ray, who tapped you out?  Because, you know, you there are certain sensitive posts, X-ray being one of them, to ensure that no prohibited items are coming through in baggage that has to be manned at all times.  You can't leave the X-ray without being tapped out.  He gave me a person's name.  I believe it was Amelia.

At that point, I explained to him that it was inappropriate the way he spoke to the passenger, the way he conducted himself with the passenger, that, you know, this was – from my personal observation, this was not hearsay that somebody told me this.  I observed the incident.  Plus it was inappropriate to ignore instructions from a lead, and definitely inappropriate to ignore instructions from a supervisor, to the point where I had to go out there and tell him three times to come into the office.

I explained to him that, you know, looking into the matter that formalized training – well, I didn't put it in that manner, but I explained to him that, you know, it would be necessary to train him, and I have him a letter of counseling, which is formalized training to document that, you know, that type of behavior is unacceptable.

As a little additional note, when I asked Amelia what she was doing, she was on a walk-through, so she would have been unable to tap him out.  You know, at that point it was apparent that he left the post without being tapped out.

(Mossa Dep. 30:15-35:11, Apr. 30, 2008.)

18

Blaylock was on notice from the July 7, 2006 incident that aggressive treatment of passengers was unacceptable to TSA. Through his statement of facts, Blaylock counters that he had been approached by "rude passenger Mr. Norberto Pagan," that he "asked [Pagan] to remove himself from . . . from his Screening Lane Because [sic] of his behavior, which infuriated the passenger," and that "the [p]assenger entered the checkpoint from another lane and expressed his displeasure for being told to go to another lane, but did not want to file a complaint." (Blaylock Statement of Facts ¶¶ 27, 28.) Without citing any support, Blaylock also asserts that "Supervisor Vincent Mossa broke TSA protocol and filed a passenger's complaint without the passenger's comments or personal contact information." (*Id.* ¶ 28.) Blaylock's account adds his contention that Pagan was also irate, but, critically, it does not undercut Mossa's recollection of his aggressive behavior.

Less than three weeks later, on the morning of July 23, 2006, the passenger incident forming the basis for Blaylock's ultimate termination took place. Passenger Rogelio Marroquin was escorting his non-English speaking mother through the B-1 security checkpoint where Blaylock was stationed. (Marroquin Decl. ¶ 1.) Marroquin, who has metal screws and rods in his legs, states that he was following his mother through the checkpoint when metal detector rang and he realized he forgot to put his cell phone into the bin. (*Id.* ¶ 2.) Marroquin claims that Blaylock "grabbed [his] cell phone and threw it so roughly into a bin that it bounced" and ordered Marroquin to take off his shoes to pass through the metal detector. (*Id.* ¶¶ 2, 3.) Marroquin explained that

> [b]ecause *I am handicapped* by a leg condition and cannot use my left arm, I move slower than other people. It was pretty crowded at the checkpoint with lots of people. *The guard* [Blaylock] *demanded that I step on the carpet and take off my shoes. I told him I needed a chair to take off my shoes*, because I cannot take off my shoes standing on one foot.

19

(*Id.* ¶ 3 (emphases in original).)  Marroquin described how Blaylock then became aggressive:

> The guard [Blaylock] got angry.  He is bigger than me.  He pushed me hard on the
> back of my shoulder.  He pushed me for several steps.  I was afraid he was going
> to punch me.  I said, "Don't push me I could fall."  He told me, "Get out of here."
> Then he repeated that several times.

(*Id.* ¶ 4.)  Shortly thereafter, Marroquin states that he complained to the other TSA personnel on

duty and made the following handwritten complaint:

> When I get in the checkpoint I took all my things out of my pocket and I forgot to
> take my cell phone and I come back out [sic] and put my phone in the machine
> and than [sic] the security guy tell me to step on the carpet because I don't took
> my shoes off and after I move to get my phone back he get angry and push me
> and he tell me get out of her [sic].

(*Id.* ¶ 4.)  Marroquin's handwritten complaint was dated July 23, 2006 with the time marked as

0530, meaning 5:30 AM.   Blaylock contends that "Mina Gad testimony [sic] witness to the

allege [sic] incident surrounding Rogelio Marroquin [sic] allegations gives facts that contradicts

Rogelio Marroquin [sic] statements of the allege [sic] incident."  (Blaylock Br. 9.)

But the deposition testimony of Transportation Security Officer Mina Gad corroborates

Marroquin's version of the events:

> Q. If you can remember, in your own words, what did you witness during
> the alleged incident that happened July 23, 2006?
> A. Okay.
> . . .
> Q. Involving the plaintiff and a passenger.
> A. Okay.  An elderly disabled gentlemen – well, appeared to be disabled –
> came through the metal detector.  He alarmed, so he was placed to the side
> awaiting additional screening.  At that time, the passenger realized he had left his
> cell phone in his pocket.  The passenger reached into his pocket, took the cell
> phone out.
> Esco [Blaylock], who was at the metal detector, saw that the passenger
> took the cell phone out of his pocket, so he took it from his hand, brought it to –
> threw it into a bin on the other side of the X-ray machine.  At that time, the
> passenger complained why did you throw my phone?  You're going to break it.
> You know, this is abuse.  And Esco said well, if I break it, I'll pay for it.

The passenger, I believe, had his mom with him.  She had already come through the metal detector, cleared.  And the cell phone went through the X-ray machine, cleared, came through the other side.  His mom, who was with the passenger, picked up the cell phone, and evidently, she wasn't aware that she wasn't supposed to give it back to the passenger.  So she gave it back to the passenger.

Esco then saw that she was giving him back his cell phone, became aggressive with the passenger, told them I want you to leave.  You're not listening to me.  Take your stuff and leave, and proceeded to push the passenger outside the metal detector.

Q. And when you say aggressive –

A. Physically placing his hand on the passenger, pushing him outside the metal detector.

Q. Was it a light push, medium push, a hard push?

A. I would say – I categorized it as aggressive because the passenger became – you know, to see the look on his face, I mean, what's going on? What are you doing?  Esco grabbed his arm and just kept shoving him outside the metal detector, told him I want you to leave.

Q. Okay. What position were you even working when you witnessed this incident?

A. If my memory serves me correctly, I was at the X-ray machine.

Q. You mentioned that the plaintiff, when he saw the passenger take the phone out of his pocket, that he took the phone and threw it into the bin.

A. Right.

(Gad Dep. 18:23-20:21, Apr. 30, 2008.)    Gad's testimony indicates that Blaylock acted aggressively while performing his screening duties.

Blaylock's factual statement about these events is as follows:

30. On July 23, 2006 at approximately 5:30am the Plaintiff was assigned to lane 3 at the start of his shift (4 amto12:30pm), being short staffed for lane 3 because it has the exit lane procedures with only three screeners.  Non passengers Rogelio Marroquin, with his brother and nephew which were issued gate passes, escorted their mother (the Passenger) entered the checkpoint through lane 3.  The mother in route to South American only speaking Spanish successfully passed through the metal detector without alarming.

31. Non Passenger Rogelio Marroquin, with a gate pass noticeably handicapped individual weighing 110 pounds 5 ft 7 inch, was asked by the Plaintiff manning the walk through Metal detector to remove his foot wear (sneakers).  Mr. Marroquin professed he was unable to remove them standing up, the Plaintiff then instructed Mr. Marroquin to divest metal objects from his pockets and place them in the X-ray machine.

32. Mr. Marroquin forgetting to divest his cell phone alarmed the walk through metal detector, the Plaintiff instructed Mr. Marroquin to pass back to the

other side and divest the cell pone (his mother waited patently for him).   Mr. Marroquin done so and was instructed by the Plaintiff to stand next to him on his right for additional Screening, because of his footwear according to TSA, FAA protocols had to be Screened.

33. Mr. Marroquin mother started to give him his items as soon as the Plaintiff turns his head to assess the situation of the walkthrough metal detector on his left.   The Plaintiff quickly noticing this transaction informed Mr. Marroquin that he cannot touch his items before being screened nor have contact. Mr. Marroquin then said "frisk me then" the Plaintiff humorously explained to Mr. Marroquin that TSA doesn't do that and explained the process to him.  The Plaintiff asked if Mr. Marroquin understands he said "YES".

35. The Plaintiff still waiting to be relieved form the Metal Detector so he can screen Mr. Marroquin and holding up traffic at the walk through on his left, Noticed Mr. Marroquin mother again handing him his items, while Mr. Marroquin shoved them in his pocket.  The Plaintiff not seeing what items were put back into his pockets instructed Mr. Marroquin to pass back through the metal detector divest his metal objects again and proceed through

36. Mr. Marroquin pass back through the walk through metal detector, while the Plaintiff turn to his right to instruct his mother by using hand gestures to stay to the right.  Mr. Marroquin disappeared down a busy isle of passenger.  The Plaintiff not knowing what just happened, after finally being relieved of the walk through metal detector placed his mother in a motor cart to her gate.

37. Mr. Marroquin unknowing to the Plaintiff, reentered the checkpoint through lane 2, and filed a complaint with the Plaintiff Supervisor Mr. Michael Lynch.

(Blaylock Statement of Facts ¶¶ 30-37.)

Blaylock's account does not dispute the basic facts.  He acknowledges that Marroquin was confused, that Marroquin was disabled, that Blaylock ordered Marroquin to remove his shoes, that Marroquin had difficulty removing his shoes while standing, that Blaylock "humorously" addressed him, and that Blaylock believed Marroquin was "holding up traffic." What also comes through is that Blaylock did not undertake special customer service efforts for a physically-challenged customer, nor does he specifically deny having a verbal altercation with Marroquin or pushing Marroquin.

Giving all possible inferences in Blaylock's favor, his narrative does not refute the witness accounts of aggressive conduct.  At best, he offers reasons for being hyper-vigilant, but

this does not amount to a material dispute about the defendants' facts, and fails to poke holes in TSA's justification for firing him.   As such, Blaylock has not met his burden of producing evidence from which a reasonable factfinder could conclude that TSA's reasons for firing him were pretextual.  Summary judgment is granted in favor of the TSA on Blaylock's claims of race discrimination in its decision to terminate him.

### b. Failure to Promote for Race Discriminatory Reasons

As discussed *supra*, the written letters from panel member-supervisors Murray, Callahan, and Harriott that ultimately blocked Blaylock's application set forth permissible, non-discriminatory bases for non-promotion, including unreliability, lack of initiative to expand his skill set, lack of leadership ability, and willingness to only work the exit lane.  As even Blaylock acknowledged, supervisor Murray did not appear to have any reason to base his negative view of Blaylock on his Native American identity.  From Blaylock's deposition testimony:

> Q. Okay.  At the time [Murray] wrote this comment on February 12th, 2004, do you think he was motivated by bias against Native Americans?
> A. Not that I know of.  I don't know.
> Q. Do you think he was – that he was motivated by bias against African-Americans?
> A. I didn't know Mr. Murray, so I can't accurately answer that.
> Q. Do you think he took your minority status into account in order to write this comment?
> A. I can't – I didn't know him.

(Blaylock Dep. 141:17-142:2, Apr. 16, 2008.)   As to Lawrence Callahan's motives when he acted to block Blaylock's promotion:

> Q. Have you seen the comment by Larry Callahan dated February 12th 2004, in which he said, "I do not support Mr. Blaylock's advance because he aspires only to work exit.  Shows little initiative to work lanes and" – I can't read the next word – "other screening duties and exhibits no leadership skills."  Why do you think Mr. Callahan wrote that?
> A. He's best friends with – you know. You know, two people share the same views.  But he knew – you know, he well enough knew that I did a lot of overtime.  He knew that I worked lanes. So his comment was inaccurate, and he knew it was inaccurate.

Q. Do you think he wrote this comment because of his bias – because of any bias against Native Americans?

A. I believe so.

Q. And what is the basis for that belief?

A. That he didn't like me.  I didn't know him.  You know, I never worked with him, to my knowledge.  But, you know, he – you know, like I said, he knew of me working overtime.  He came on the checkpoint on different shifts and saw me work overtime in different lanes, and that would be my only conclusion.

Q. Do you have any other proof for your belief that Mr. Callahan wrote this because of your Native American heritage?

A. It could have been a number of things, whether it was, you know, because of that or whether it was because of my sexuality, because that statement is inaccurate.  You know –

Q. Now, listen to my question.  Other than your subjective belief, do you have any proof that Larry Callahan wrote this because of your Native American heritage?

A. I would say biasly [sic], yes, but, you know, to pinpoint it on any one thing, I can't elaborate on that, because that's –

Q. What's the proof you have?

A. Well, the fact that I worked the other lanes, the overtime that I worked. I mean, he knew.  He's a screening manager.  Unless he can, you know – unless he can say that he's been a screening manager and only confined himself to – to the management office, that's one thing, but I know from experience that I've seen that gentleman numerous occasions on the different shifts, on shift one and shift two.  He's observed me working.

You know, I mean, it's easy to say hi to someone and not like them just to be friendly, hi, but he's seen – he observed me working.

Q. Okay.  Do you believe that Larry Callahan wrote this statement on February 12th, 2004, because of – because you are male?

A. No.

Q. Do you believe he wrote this comment because of your sexual preference?

A. I believe so.

Q. And what basis do you have for that belief?

A. I really can't say, but that's my personal belief.  I don't have, you know, any real proof, solid proof, as in, you know, paperwork of that time. But that's my personal belief based on his comments and what I know that he observed.

Q. Did he observe your sexual preference?

A. He might have heard.

Q. You don't know what he knew about your sexual preference; is that correct?

A. It went around where a screener told me, you know, the otherwise, about information about my EEO that they wasn't privileged to.

Q. Listen to the question.  You have no objective knowledge that Mr. Callahan was aware of your sexual preference, correct?

24

> A. He was.  Matter of fact, they was inside – Larry Callahan and Henry, they were written e-mails from Quotomome along with all the other screening managers, so they did know.  And it was the e-mail transmissions that I submitted in my documents, come to think of it.  They were made aware of it by Lisa Quotomome about my complaint and about me being harassed and such.

(Blaylock Dep. 142:3-145:5, Apr. 16, 2008.)

Blaylock's testimony concerning Callahan's motives is in the main confusing and non-responsive, with one exception – a last-minute reference to email transmissions about his EEO complaint.  If Blaylock's testimony is understood correctly,[5] the emails he refers to were exchanged between TSA supervisors and internal TSA legal advisors on December 17, 2004 regarding Blaylock's possible re-assignment to accommodate Blaylock's transfer request and how to proceed in light of his complaint that screeners were "teasing" Blaylock after he made his EEO complaint.

But Callahan opposed Blaylock's promotion in February 2004, some *ten months before* receiving Cardamone's emails regarding Blaylock's EEO complaint (in December 2004).  This chronology indicates there is no way that information learned from the "Cardamone" emails concerning the EEO complaint could have affected Callahan's decision to block Blaylock's promotion.

Moreover, upon review, those December 2004 emails between Cardamone (Quotomome) and other TSA personnel constitute deliberations by management as to how to go about protecting TSA and minimizing any harm to Blaylock, and do not suggest anything improper.

The first email was sent by supervisor Henry Murray:

---

[5] In his deposition testimony, Mr. Blaylock refers to "written e-mails from Quotomome along with all the other screening managers."  Blaylock states that this "Lisa Quotomome" made those supervisors aware of his complaint. Emails fitting that description appear in the record as Exhibit H to the Declaration of Pamela Perron.  The transcript reflects that Blaylock referred to a "Lisa Quotomome," although the Court recognizes no such person in the record and observes that he was referencing emails between a similar-sounding named person, "Elissa Cardamone," and other TSA supervisors and TSA legal personnel.

From: Murray, Henry
Sent: Friday, December 17, 2004 9:45 AM
To : Candino, Jeff; Cardamone, Elissa; Whalen, Raymond; Thompson, Elaine; Powell, Barbara <TSA OCC>; Danner, John <TSA OCC>; Fox, Edgar <TSA OCC>
Cc: Ruiz, Ofelia; Pellegriti, John; Rempusheski, John; Murray, Henry; Harriott, Curtis; Callahan, Lawrence; Dykes, Michael
Subject: LTSS Esco Blaylock

   There was an incident report on my desk this AM with a doctors note and a request for change of assignment from LTSS Esco Blaylock. He is RDO today. He stated that since he has brought with his EEO complaint screeners in Terminal C have been teasing him. He states that he went to the doctor because he is depressed. I had Michael transfer him to A2-1 effective tomorrow when he returns to work and gave John Rempusheski the paperwork.

(Exh. H, Perron Decl.)  This was followed by a reply from Attorney-Advisor John Danner:

From: Danner, John <TSA OCC>
Sent: Fri 12/17/2004 10:42 AM
To: Murray, Henry
Cc: Whalen, Raymond; Cardamone, Elissa; Candino, Jeff; Ruiz, Ofelia; Pellegriti, John; Rempusheski, John; Harriott, Curtis; Callahan, Lawrence; Dykes, Michael; Powell, Barbara <TSA OCC>; Thompson Elaine
Subject: RE LTSS Esco Blaylock

Henry,
   I recommend that TSAC EWR do the following as a follow up to the information provided by Mr. Blalock:

   1. TSA EWR should immediately investigate Mr. Blalock's allegations. On their face, the allegations tend to show a hostile workplace discrimination claim. We should move quickly to investigate and take action as appropriate against those TSA employees who harassed Mr. Blalock.  A statement should be taken from Mr. Blalock, as well as from other witnesses.

   2. TSA EWR should be very careful to refrain from discussing any EEO matters outside the sphere of those who need to know about the case.  The privacy of employees must be protected.

   Please let me know if you have any questions.

Regards,
John

John V. Danner, Jr.
Attorney-Advisor
U.S. Department of Homeland Security
Transportation Security Administration
Office of Chief Counsel
Newark Liberty International Airport

(Exh. H, Perron Decl.)  The next email on this thread followed from another member of TSA's

Office of Chief Counsel ("OCC"):

From: Powell, Barbara <TSA OCC>
Sent: Friday December 17, 2004 12:00 PM
To: Danner, John <TSA OCC>; Murray, Henry
Cc: Whalen, Raymond; Cardamone, Elissa; Candino, Jeff; Ruiz, Ofelia; Pellegriti,
John; Rempusheski, John; Harriott, Curtis; Callahan, Lawrence; Dykes, Michael;
Powell, Barbara <TSA OCC>; Fox, Edgar <TSA OCC>; Thompson, Elaine
Subject: RE: LTSS Esco Blaylock

Thanks for the information, Henry. John's advice is sound. Terminal C Managers
need to step up here – please ensure that Ofelia and Remp are aware of this issue
and that they are or they have tasked someone to address these issues. Please
document what action is taken to minimize the agency's exposure and keep us in
the loop here.  Thanks.


(Exh. H, Perron Decl.)  In the next email, Cardamone, who was acting Assistant Federal Security

Director at Newark Liberty, also sought legal advice concerning possible re-assignment of

Blaylock:

From: Cardamone, Elissa
Sent: Friday December 17, 2004 2:39 PM
To: Powell, Barbara <TSA OCC>; Danner, John <TSA OCC>; Murray, Henry
Cc: Whalen, Raymond; Cardamone, Elissa; Candino, Jeff; Ruiz, Ofelia; Pellegriti,
John; Rempusheski, John; Harriott, Curtis; Callahan, Lawrence; Dykes, Michael;
Fox, Edgar <TSA OCC>; Thompson, Elaine
Subject: RE: LTSS Esco Blaylock

Can we move Mr. Blaylock to the Light Duty Shift based upon his claim of
light/mod duty needs, while investigation of his allegations continues?

As acting AFSD for (20 more days!) I have deemed and otherwise recognized 3rd
shift to be The Light/Modified Duty Shift based upon PMIS pax processing data.

Lead mgrs and I have identified seven/7 people who are in full performance and are assigned to what is in the process of becoming the Light/Mod Duty Shift. These first 7 of more to be identified, will be reassigned to either the first or second Full Performance shift.  The move will take place after Jan 1 05 to provide shift change notification.

Blaylock's move could be part of the Jan 1 move, or the next group, or group after. Can this be done without raising other allegations?

(Exh. H, Perron Decl.)  Danner replied with further advice in response to Cardamone's question:

> From: Danner, John <TSA OCC>
> Sent: Friday December 17, 2004 3:55 PM
> To: Cardamone, Elissa
> Cc: Whalen, Raymond; Candino, Jeff; Ruiz, Ofelia; Pellegriti, John; Murray, Henry; Rempusheski, John; Powell, Barbara; Fox, Edgar <TSA OCC>
> Subject: RE: LTSS Esco Blaylock
>
> Elissa,
>
> Per my conversation with you, Ofelia and John Remp moments ago, John will draft a written response to Mr. Blaylock.  The response will acknowledge that Mr. Blaylock requested a transfer to another Terminal, i.e., an accommodation, because he is suffering depression as a result of his fellow TSA Screeners harassing him because of his sexual orientation.  I have discussed with John that will review the letter or assist him as needed.
>
> Today was Mr. Blaylock's first day at a different Terminal (A) since making his request.  Ofelia agreed to contact Mr. Blalock and advise him that TSA EWR will respond to him in writing.  She also agreed to confirm with him that all went well today at Terminal A and that his accommodation request was met. This information will be incorporated into the letter John R. is preparing.
>
> Finally, we discussed whether Mr. Blaylock should be moved to the overnight shift and placed in a limited or light duty status.  I advised that Mr. Blaylock remain in the (new) Terminal A slot where he started today. Assuming he is satisfied with the move, his status can remain as is.
>
> Please let me know if you have any questions. Thanks.
>
> Regards,
> John

(Exh. H, Perron Decl.)   In sum, the December 2004 emails between Cardamone and TSA

supervisory staff and legal advisors do not appear to have given information on anything but a

need-to-know basis, and reflect a discussion about how to best address Blaylock's complaint and

request for transfer.

Blaylock gave testimony about the third supervisor, Curtis Harriott, who blocked

Blaylock's promotion:

> Q. Curtis Harriot.  And I assume you have seen his statement written
> February 12th, 2004.  "In my opinion, Esco Blaylock is not a good candidate for
> supervisor.  He has never worked any position other than the exit lane, and never
> willingly accepts any task given.  He does not see the big picture."  Are you aware
> of this statement?
> A. Yes.
> . . .
> Q. Okay. I just want to finish up with Curtis Harriot.  Do you believe he
> made this comment on February 12th, 2004, saying that you would not make a
> good supervisor because of your race?
> A. I don't know what he believed.
> Q. Do you think he made this comment because of your colour?
> A. I don't know what he believed.
> Q. Do you think he made this comment because you are male?
> A. If he believed that.  But I don't know what he believed on that.
> Q. Were there other applicants who were strictly heterosexual who were
> not chosen for the promotion?
> A. Yeah.
> Q. Yeah. Were there applicants who were not members of any Native
> American group who also were not chosen for the position?
> A. I don't know.
> Q. Were there Caucasians who where not chosen for this promotion?
> A. Yeah, yeah.  I know one or two, yeah.
> Q. Were there women who were not chosen for this promotion?
> A. Absolutely.

(Blaylock Dep. 145:18-152:13, Apr. 16, 2008 (portions omitted).)   Less than a month later,

Blaylock also testified:

> Q. Mr. Harriet [sic] did not write his note because you are black, did he?
> A. I don't know what his intentions were.  I have no idea what Mr.
> Harriet's intentions were, honestly.

Q. You have no reason to believe that he took into account that fact that you are black, do you?

A. I have no idea what his intentions were concerning race.

Q. You just told me that black is your color not your race?

A. Yeah, black is the color of my skin. I don't know what his intentions were, you know, concerning that. I don't know what his intentions were, which you had previously asked me and that's only on one, one why he wrote that – what he wrote.

Q. So your allegation is that he wrote that note because you are bisexual?

A. Yes.

Q. Okay. Your allegation is not that he wrote that note because of your Indian heritage or because of your color?

A. Yeah, no. I'm not making those allegations.

Q. Is that correct?

A. That's correct.

(Blaylock Dep. 101:13-102:13, May 14, 2008.)

At best, Blaylock speculates that the three panel member-supervisors disliked him because of his work habits or propensity for working overtime, neither of which are actionable here, and that news of his EEO complaint may have filtered over to them. His proofs fall short of creating a material issue of fact about whether his promotion was blocked for discriminatory reasons. *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); *see also Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981) ("[A] party resisting a [summary judgment] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."); *Warner v. Fed. Express Corp.*, 174 F. Supp. 2d 215, 223 (D.N.J. 2001) (conclusory assertions of discrimination and pretext without any such evidence to support those claims is insufficient to create genuine issue of material fact).

As the Third Circuit has set forth, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered

reason is a pretext). *Fuentes*, 32 F.3d at 764 (emphasis added).  Because Blaylock was not able to rebut the non-discriminatory justifications provided by the three supervisors blocking his promotion, and was not able to produce evidence from which a reasonable factfinder could conclude those reasons were pretext, then his failure to promote claim cannot survive summary judgment.

### c. Retaliation

As part of his retaliation claim, Blaylock cites an event following his consulting with an EEO lawyer on July 27, 2006.  At checkpoint B1 on September 13, 2006, Blaylock told supervisor Katherine Anchundia that he was feeling sick.  (Perron Decl., Exh. W (Anchundia Aff.); Pl.'s Narr. ¶ 54.)  Before Anchundia could find another screener to replace him, Blaylock left his post and headed to Trinitas Hospital, and Anchundia marked him absent without leave, or AWOL.  (Perron Decl., Exh. W; Pl.s' Narr. ¶ 54.)  TSA states that Anchundia was unaware of Blaylock's prior protected EEOC activity and his purported Native American heritage and sexual orientation at that time.  (Perron Decl., Exh. W.)  During the next pay period, Blaylock provided TSA with a doctor's note explaining his absence of September 13, 2006, after which Mossa retroactively corrected the AWOL designation and credited Blaylock with sick leave time. (Perron Decl., Exh. W; Mossa Dep. 61:4-62:6.)  Because Blaylock's visit to Trinitas Hospital was eventually documented, and the AWOL designation was removed without question upon presentation of a medical note, this event does not amount to adverse employment actions and falls short of satisfying the *prima facie* test for retaliation.

Following his EEOC complaint filed July 2004, on December 10, 2004, Blaylock complained to TSA management that he was being harassed at his checkpoint C2 post in Terminal C and requested a transfer.  (Perron Decl., Exh. F (Dec. 12, 2004 Change Request).) As the reason he sought the change, Blaylock stated: "Constant hazing of my leaked information

[sic] depression, nervousness etc." (*Id.*) Blaylock's transfer was approved on December 15, 2004 (*id.*), and December 17, 2004 internal TSA correspondence, as discussed *supra* (*i.e.* the Cardamone emails), demonstrates that TSA responded to Blaylock and sought to avoid taking action that could be construed as retaliatory. (Perron Decl., Exh. H.) Blaylock has failed to rebut or cast doubt on TSA's record evidence.

Blaylock's various *pro se* submissions and his motion papers contain numerous assertions—mostly without any support—that TSA was targeting him for discriminatory and retaliatory reasons. The Court has addressed above those assertions that could conceivably be characterized as adverse employment actions and they do not have merit. The balance constitutes bare assertions that do not rise to an actionable level. Taken as a whole, Blaylock's showing fails to meet his evidentiary burden and his retaliation claims are dismissed.

### 2.      "Sexual Orientation" Claims

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that Title VII's ban on sex discrimination includes two types of sexual harassment: "*quid pro quo*" harassment, in which sexual conduct is connected to an economic benefit, and "hostile work environment" harassment, in which the alleged conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. 1604.11(a)(3)). Consequently, "when a supervisor harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64.

Far from showing harassment, Blaylock makes barely any showing that a coworker or supervisor even knew of his claimed unconventional sexual orientation of being attracted to transsexuals:

Q. Okay.  When was this conversation?

A. . . . We had a supervisor – I'm trying to think of his name.  But he had asked me – he had asked me – he says – he had mentioned about my heritage, but then he had said, you know, out loud, you know, by the podium, *and you're not gay, are you*?  Just like that.

Q. *What's this supervisor's name*?

A. *And it wouldn't narrow it down if I say he has gray hair.  I forget his name, but he has relations with the lead, the female that I spoke about*.

Q. What time of day was it?

A. This was in the – this was during the morning shift, the first shift.

Q. Okay. What time would that be?

A. It could have been between 10:00, 11:00, because it was relatively – the rush hour slowed down, so I'm only approximate it was around that time.

Q. And who else was present?

A. You had people in the distance but not close enough. I'm not sure whether they heard or not, and I didn't check to see if anybody did hear, because I wanted to try to save face and, you know, not even acknowledge it.  But it was offensive to me.

Q. *Do you know the names of the any people who were present at that time*?

A. *No*.

Q. *So I guess it would be fair to say you don't know the names of anybody who heard that comment*.

A. *Yeah.  I mean you know, I don't know their names. You know, I don't know their names*.

. . .

Q. Now, this comment in early 2004 by a supervisor whose name you can't recall, "You're not gay, are you," did you complain about that to anyone?

A. That was – after being offended, that's when I, you know – and you know, just let me, you know, go back for a minute.  It could have been early 2003 to 2004, but it was borderline and, you know, from there.

Q. Are you saying late 2003?

A. Yes, I'm sorry.  Yeah, late 2003, 2004, to be approximate, but that's what really -- you know, after hearing the comment about, you know, my – you know, them asking me about my Native American heritage and then that, it was like oh, wait a minute, hold on, you know.  I don't talk about myself.  What's going on? Where did he hear this from?

Q. *What do you think prompted that comment*?

A. *I have no idea because I don't act feminine.  As far as I know, no one's seen me anywhere because all I did was work, so I was clueless, you*

33

*know, shaking my head, you know.  I don't socialize with – I don't know
anyone – no one in New Jersey, and no one ever came, you know, as far as I
was concerned, to the Bronx*.

But, you know, the amount of hours I had done and going to school, it
was, you know, work, work, school, home, you know? And go to sleep for about
three, four hours, get up, go to work.

Q. Okay.

A. Every day.

Q. *Was this the first comment about – of a sexual nature*?

A. *That was the first one, very first one*.

. . .

A. I mean, I can only speculate, you know, speaking of the, the female
lead and the supervisor.  That particular supervisor, I mean, he, he as liked by
everyone.

Q. The supervisor with the gray hair whose name you can't recall?

A. Yeah, I believe his name is George.  If not, we have a list in there.  I
can pick out his name possibly, you know, from that list and get you a name, but –

Q. Well, this George supervisor, he's the one who commented, "You're
not gay, are you"?

A. Yeah.

Q. Okay. *Do you have any proof or reason to believe that he
communicated with officials responsible for the selection process about your
membership in any minority*?

A. *I mean, the proof would be that it got to him.  You know, the airport
is like a soap opera*.

Q. Yeah, but –

A. One person finds out –

Q. No, let's not talk about speculation and assumption.

A. Okay.

Q. *What proof do you have that that person told someone in the
selection process that you were gay*?

A. *I have no proof*.

Q. By the way, how did you respond to his comment?

A. I didn't. Like I said, I saved – tried to save face and I just slowly
walked away, because I was embarrassed and I just didn't say nothing.

(Blaylock Dep. 76:5-77:19;  81:3-82:8; 98:19-99:22, Apr. 16, 2008 (emphases added).)

Even though Blaylock alleges sexual discrimination on the basis of his sexual orientation,

he testified that he is "not attracted to men," that he conformed to the stereotypes that people

expect to see in a man while employed by TSA, and that he has been married to women.  In

context, then, there is no suggestion in the record that his appearance or personal information

34

would have attracted homophobic comments or discriminatory treatment.  His proofs come down to his recounting of one or two stray remarks and an absence of a showing that his co-workers knew about his sexual experiences with transsexuals.  As the Supreme Court has observed, when the limitations on Title VII suits are "[p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The Court is mindful that "standards for judging hostility are sufficiently demanding to ensure that Title VII[6] does not become a 'general civility code.'"  *Id.*  The isolated question posed to Blaylock about his sexual orientation by an unnamed co-worker, which may (or may not) have been overheard, falls within this category of non-actionable workplace conduct. Blaylock's proofs being so minimal that no reasonable fact-finder could render a verdict in his favor, summary judgment with respect to his claims of harassment or discrimination based upon sexual orientation is granted in favor of defendants.

## V.    CONCLUSION

The Court has carefully examined Blaylock's claims of discrimination based on race and sexual orientation, and concludes that he has failed to support them with a sufficient quantum of evidence to defeat summary judgment.  TSA's motion for summary judgment is granted and the action will be dismissed.  An appropriate order will be entered.


/s/ Katharine S. Hayden
Hon. Katharine S. Hayden
United States District Judge

---

[6] To establish a claim for sexual harassment under 42 U.S.C. § 2000e-2(a)(1), a plaintiff must prove that (1) the subject conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.  *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 n.4 (4th Cir. 1996) (holding sexual-orientation discrimination outside the scope of Title VII).